UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| AUGUSTO DE LEON,<br><br>Plaintiff,<br><br>v.<br><br>RICOH USA, INC., et al.<br><br>Defendants. | Case No. 18-cv-03725-JSC<br><br>**ORDER RE: PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Re: Dkt. No. 45 |

Augusto De Leon brings a class action against Ricoh USA, Inc. ("Ricoh USA"), Ricoh Americas Corporation ("Ricoh Americas"), and IKON Office Solutions, Inc. ("IKON") (collectively, "Ricoh" or "Defendants"), alleging wage and hour violations under California state law, and violations of the Fair Labor and Standards Act ("FLSA"), 29 U.S.C. §§ 201 et seq., among other claims. (Dkt. No. 29.)[1] Now before the Court is Plaintiff's unopposed motion for final approval of the parties' class action settlement agreement and for attorneys' fees and costs.[2] (Dkt. No. 45.) Having considered the motion and having had the benefit of the final approval hearing on March 26, 2020, the Court GRANTS the motion for final approval and GRANTS IN PART the requested attorneys' fees and costs.

**BACKGROUND**

## I.     The Parties

Ricoh USA is corporation incorporated under Ohio law, with its headquarters and principal place of business in Malvern, Pennsylvania. (Dkt. Nos. 1 at ¶ 9 & 29 at ¶ 9.) Ricoh USA is

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

[2] All parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). (*See* Dkt. Nos. 7 & 8.)

1   authorized to do business in California.  (Dkt. No. 29 at ¶ 9.)  It produces, distributes, and services

2   office equipment, including printers, photocopiers, and fax machines throughout the state.  (*Id.*)

3   IKON was an Ohio corporation before changing its name to Ricoh USA on April 1, 2012.  (Dkt.

4   No. 1 at ¶ 11; *see also* Dkt. No. 29 at ¶ 10 n.2.)  Ricoh Americas was a Delaware corporation that

5   merged into Ricoh USA on April 1, 2016.  (Dkt. No. 1 at ¶ 13; *see also* Dkt. No. 29 at ¶ 11 n.3.)

6           Plaintiff is a former Ricoh employee.  (Dkt. No. 29 at ¶ 8(a).)  He worked at the company's

7   Petaluma, California location "as a field service representative and technology service technician"

8   from May 2000 to November 2017.  (*Id.* at ¶ 8(a),(b).)

9   **II.     Complaint Allegations**

10          Ricoh paid Plaintiff an hourly wage.  (*Id.* at ¶ 18.)  Ricoh also pays hourly wages to the

11  California employees who perform work similar to the work Plaintiff performed ("Ricoh

12  Employees").  (*Id.* at ¶ 20.)  Over the course of Plaintiff's employment, he was subjected to a

13  litany of unlawful conduct related to compensation, meal and rest breaks, expense reimbursement,

14  accrual and payment of sick leave, wage statements, and maintenance of records, among others, as

15  part of Ricoh's policies, practices, guidelines or procedures.  (*See id.* at ¶¶ 21-44.)  Ricoh

16  Employees were subjected to the same unlawful employment practices.  (*Id.* at ¶ 22.)

17  **III.    Settlement Agreement[3]**

18          **A.     The Class**

19          The class consists of "[a]ll current or former hourly non-exempt employees of Defendants

20  who held the position of technology service technician, field support representative, and/or other

21  positions engaged in similar work for Defendants in the state of California during the period of

22  May 22, 2014 through the Preliminary Approval Date," November 25, 2019 (the "Class Period").

23  (Dkt. No. 37-1 at ¶ 58.)  There are 991 class members.  (Dkt. No. 45-6 at ¶ 3.)  As of March 18,

24  2020, one class members had opted out, and no class member had objected to the settlement.

25  (Dkt. No. 47 at ¶¶ 6, 7.)

27  [3] The parties amended their settlement agreement, (Dkt. No. 37-1), to address concerns raised by
28  the Court at the preliminary approval hearing, (*see* Dkt. No. 43 at 3).  The parties submitted the
    amendments to the Court on November 21, 2019, (Dkt. No. 42-2).  The Court refers to the original
    agreement and the amendments collectively as the "Settlement Agreement" or "Agreement."

### B.     The FLSA Collective

The FLSA Collective is identical to the Settlement Class with the exception of the relevant time period, which begins one year after the Class Period.  (*See id.* at ¶ 37 (defining "FLSA Collective" as covering "the period of May 22, 2015 through the Preliminary Approval Date" ("FLSA Period")).)  Thus, members of the FLSA Collective fall within the Settlement Class.

### C.     Payment Terms

Ricoh agrees to pay $2.2 million ("Gross Settlement Amount") to the Court-approved settlement administrator ("Claims Administrator")[4] within 15 days of the Court's order granting final approval.  (*Id.* at ¶¶ 61, 73.)  The Gross Settlement Amount is non-reversionary, and does not cover Ricoh's attorneys' fees, litigation costs, or employer taxes.  (*Id.* at ¶ 61.)  Pursuant to the Agreement, the Claims Administrator will pay the following from the Gross Settlement Amount: (1) $55,000 as consideration for release of the FLSA claim by participating FLSA collective members ("FLSA Settlement Amount"); (2) $75,000 to the California Labor and Workforce Development Agency ("LWDA") to cover civil penalties under the Private Attorneys General Act of 2004 ("PAGA");[5] (3) $10,000 Service Award to Plaintiff as Class Representative; (4) $550,000 to Class Counsel for fees; (5) $14,305.04 to Class Counsel for costs; and (6) $30,000 to the Claims Administrator.[6]  (Dkt. No. 47 at ¶ 12.)  The remainder, $1,465,694.96 (the "Net Settlement Amount"), constitutes the portion distributable to class members who do not opt-out ("Class Member Shares").  (*Id.*; *see also* Dkt. No. 37-1 at ¶¶ 46, 63(a).)

#### 1.     Individual Settlement Shares

##### a. Class Member Shares

The Claims Administrator will distribute the entire Net Settlement Amount to class

---

[4] The parties have selected an experienced settlement administration firm, CPT Group, Inc. ("CPT"), to act as Claims Administrator.  (*See* 45-1 at ¶ 10; *see also* Dkt. No. 45-6.)
[5] The Claims Administrator will allocate $100,000 from the Gross Settlement Amount for PAGA civil penalties. (Dkt. No. 37-1 at ¶ 62(f).) In accordance with Labor Code § 2699(i), the Claims Administrator will pay $75,000 to the LWDA and the remaining $25,000 will be allocated to the portion of the Gross Settlement Amount distributable to participating class members.  (*See id.*)
[6] The Settlement Agreement recognizes that the amounts payable to Class Counsel, the Claims Administrator, and Plaintiff as Class Representative are subject to Court approval.

members as follows:

> The Claims Administrator will calculate the aggregate total number of Workweeks worked by the Settlement Class during the Class Period based on Defendants' calculations set forth in paragraph 63(a)(i). Class Workweek Value will be determined by dividing the Net Settlement Amount by the aggregate total of Workweeks worked. The Claims Administrator will calculate Class Members' estimated Class Member Share by multiplying the individual Class Member's total Workweeks by Workweek Value.

(*Id.* at ¶ 63(a)(ii).)  In other words, each class member will receive a pro rata share of the Net Settlement amount based on the number of weeks the individual worked during the class period. If an individual opts-out, the Claims Administrator will redistribute their estimated share of the Net Settlement Amount to participating class members.  (*Id.*)

One-quarter (25%) of each class member's individual share "constitute[s] wages for purposes of IRS reporting."  (*Id.* at ¶ 63(d).)  The remaining 75% "constitute[s] payments for liquidated damages, penalties, and interest."  (*Id.*)  The Claims Administrator will issue IRS W-2 forms for the wage payments, and IRS 1099 forms "for all other payments."  (*Id.*)  Class members are "exclusively liable for any and all of their respective tax liability" and "responsible for paying all applicable state, local, and federal income taxes on all amounts" received pursuant to the Settlement Agreement.  (*Id.* at ¶ 65.)

In support of final approval, Plaintiff submits the declaration of Stephen Gomez on behalf Claims Administrator CPT.  Mr. Gomez attests that as of March 18, 2020, 990 class members will receive a portion of the Net Settlement Amount.  (Dkt. No. 47 at ¶ 11.)

### b. FLSA Settlement Shares

The Claims Administrator will distribute the entire FLSA Settlement Amount, which is taken from the Gross Settlement Amount, to all class members eligible to opt-in to the FLSA Collective ("collective-eligible class members").  (*Id.* at ¶ 63(b).)  Each collective-eligible class member will receive a check from the FLSA Settlement Amount ("FLSA Settlement Share").  (*Id.* at ¶ 63(b).)  Individuals who opt-in to the FLSA Collective by cashing that check will become "Participating Collective Members."  (*Id.*)  The distribution will be as follows:

> Collective-Eligible Members who worked no more than [10]

United States District Court
Northern District of California

Workweeks during the FLSA Period shall receive an FLSA Settlement Share equal to [$20.00]. Participating Collective Members who worked more than [10] Workweeks during the FLSA Period shall receive an FLSA Settlement Share of [$20.00] plus an additional amount from the remainder of the FLSA Settlement Amount after [$20.00] is allocated to each Participating Collective Member. Such remainder of the FLSA Settlement Amount is to be distributed pro rata to Participating Collective Members who worked more than [10] Workweeks during the FLSA Period based on the number of Workweeks the Participating Collective Member worked in excess of [10].

(*Id.*) The Claims Administrator's calculation for determining the "additional amount" due Participating Collective Members who worked in excess of 10 workweeks during the FLSA Period tracks the calculation used to determine the Class Member Shares.[7] (*Compare* Dkt. No. 37- 1 at ¶ 63(b)(ii) *with id.* at ¶ 63(a)(ii).) The entirety of each Participating Collective Member's individual FLSA Settlement Share will "constitute payments for liquidated damages, penalties, and interest," and the Claims Administrator will issue 1099 forms for tax purposes. (*Id.* at ¶ 63(d).) Like class members, the Participating Collective Members are "exclusively liable for any and all of their respective tax liability" and "responsible for paying all applicable state, local, and federal income taxes on all amounts" received pursuant to the Settlement Agreement. (*Id.* at ¶ 65.)

The Claims Administrator attests that as of March 18, 2020, 934 collective-eligible members will receive the $20.00 payment, totaling $18,680. (Dkt. No. 47 at ¶ 10.) The remaining $36,320 will be allocated to Participating Collective Members proportionally, based on their number of work weeks. (*Id.*) The average settlement award for class members and Participating Collective Members (collectively, "class members") "is $1,536.06, the highest settlement award is $2,835.85, and the lowest award is $9.40." (*Id.* at ¶ 13.)

### 2. Unclaimed Funds

Class members must cash or deposit their checks within 90 days of issuance. (Dkt. No. 42-2 at 7 (joint stipulation amending ¶ 74 of the Agreement).) Sixty days after issuance of payment,

---

[7] Class members and collective-eligible members had 45 days after the Claims Administrator mailed the Notice to dispute the amount of their individual workweeks shown on their respective Notices. (*Id.* at ¶ 63(c).) The Claims Administrator attests that as of March 18, 2020, it "ha[d] not received any objections or disputes of work weeks" from class members or collective-eligible members. (Dkt. No. 47 at ¶ 6.)

5

the Claims Administrator will send a written reminder and call each individual who has an outstanding settlement check and remind them that the check "will expire and become non-negotiable" after the 90-day deadline. (*Id.* at 8.) If the amount of unclaimed funds after the 90-day deadline is less than $80,000, those funds will be distributed *cy pres* to the "East Bay Community Law Center's Community Economic Justice Clinic for its Services and/or Youth Advocacy Initiatives," within 5 days after expiration of the deadline.[8] (*Id.*)

If the amount of unclaimed funds exceeds $80,000, the Claims Administrator will "make a second distribution on a pro rata basis to participating Class Members who previously cashed their settlement checks." (*Id.*) The second distribution checks will remain valid for 90 days. (*Id.*) Any funds remaining from the second distribution after expiration of the 90-day deadline will be remitted to the same *cy pres* beneficiary. (*Id.* at 8-9.)

### D. Notice

The Claims Administrator, CPT, attests that it received a class list from Defendants' counsel containing data for 991 class members on December 11, 2019. (Dkt. No. 45-6 at ¶ 3.) Of the 991 class members, 935 were also part of the FLSA collective. (*Id.* at ¶ 8.) CPT conducted a "National Change of Address" search before mailing the Notice Packet to the 991 class members on December 19, 2019 via first class mail. (Dkt. No. 45-6 at ¶¶ 4, 7; *see also* Dkt. No. 45-6, Ex. A (Notice Packet).) CPT also emailed Notice Packets to 36 class members who had an email address on file. (Dkt. No. 45-6 at ¶ 9.) The Notice Packet included the Court-approved Notice and "the individual's credited weeks worked and estimated settlement award." (*Id.* at ¶ 7.) As of February 17, 2020, 27 Notice Packets had been returned by the U.S. Postal Service ("USPS"); of the 27, the USPS provided a new address for five of the addressees. (*Id.* at ¶ 10.) CPT performed a skip trace for the other 22 using Accurint, a "comprehensive address database[ ]" that "utilizes hundreds of different databases supplied by credit reporting agencies, public records, and a variety of other national databases." (*Id.*) Ultimately, 12 Notice Packets were undeliverable. (*Id.* ¶ 11.)

---

[8] Class Counsel attests that neither it nor Plaintiff has any affiliation with the *cy pres* recipient, nor has anyone associated with either Plaintiff or Class Counsel "served on the board of directors" for the *cy pres* recipient. (Dkt. No. 37-2 at ¶ 27.)

1   Class members had until February 3, 2020 to opt out, object to the Agreement, or dispute

2   their work week calculations.  (*Id.* at ¶ 11.)  CPT received only one request for exclusion, and

3   received no objections or disputes over work weeks.  (*Id.* at ¶¶ 12-14.)  Further, the Notice

4   informed class members that Plaintiff would file his motion for motion for attorneys' fees, costs,

5   and service award by February 20, 2020, and it would be available for review on the claims

6   website (www.cptgroup.com/RicohSettlement), the Court's docket via PACER, or through the

7   Clerk of Court.  (*See* Dkt. No. 45-6, Ex. A at 15.)  The Notice informed class members that they

8   had until March 12, 2020 to file a written objection with the Court regarding the motion.  (*Id.*)

9   The Court received no objections.

10      **E.      Release**

11   Class members agree to release Ricoh "and all of their former, present or future affiliated

12   entities and third parties, including but not limited to parents, subsidiaries, partners, owners,

13   shareholders, officers, directors, employees, agents, and subcontractors" (the "Released Parties")

14   from all known and unknown wage claims under California law that arise out of the facts alleged

15   in the second amended complaint during the Class Period.  (Dkt. No. 37-1 at ¶¶ 54, 75.)  The

16   released claims do not include: "(1) the FLSA Claim; (2) claims for Worker's Compensation; (3)

17   claims for unemployment or disability payments; (4) claims for discrimination, retaliation or

18   harassment; (5) tort claims; (6) or any other claims that cannot be released as a matter of law."

19   (*Id.* at ¶ 75.)  Participating Collective Members also agree to release Ricoh and the Released

20   Parties "from any known or unknown claims for unpaid wages, including overtime wages, under

21   the FLSA based on the facts asserted in the operative complaint" arising during the FLSA Period.

22   (*Id.* at ¶ 75(a).)  In addition, Plaintiff, as class representative, agrees to a general release of Ricoh

23   and the Released Parties from "any and all claims," including all unknown claims covered by

24   California Civil Code § 1542.  (*Id.* at ¶ 75(b).)

25   **IV.    Procedural History**

26   Plaintiff filed a class and representative action against Ricoh in the Superior Court of the

27   State of California, County of Sonoma in May 2018, alleging multiple wage and hour violations

28   under the California Labor Code, violation of California's Unfair Competition Law ("UCL")

United States District Court
Northern District of California

1   under the Business and Professions Code, and seeking relief under PAGA.[9]  (Dkt. No. 1, Ex. A at

2   14-15.)  Ricoh removed the action to this Court pursuant to the Class Action Fairness Act

3   ("CAFA"), 28 U.S.C. § 1332(d).  (Dkt. No. 1 at 3.) Plaintiff filed a first amended complaint

4   ("FAC") in October 2018, bringing the same claims but revising the proposed class pursuant to the

5   parties' stipulation.  (*See* Dkt. Nos. 14 – 14-2.)

6         After an initial round of discovery, the parties agreed in January 2019 to mediate the case

7   "with well-respected mediator Lisa Klerman, Esq. in Los Angeles, California."  (Dkt. No. 45-1 at

8   ¶¶ 5-6.)  The parties "exchange[d] additional information and documents in advance of

9   mediation."  (*Id.* at ¶ 6.)  In March 2019, the parties "attended a full day of private mediation"

10  with Ms. Klerman and reached a settlement in principle "after extensive negotiations."  (*Id.*)  The

11  parties' agreement is reflected in the "Joint Stipulation and Agreement for Class Action Settlement

12  and Release of Claims" ("Settlement Agreement" or "Agreement").  (*Id.* at ¶ 8.)

13        The parties then filed a stipulation in this Court requesting leave for Plaintiff to file a

14  second amended complaint to supplement the claims in the FAC with those brought in the related

15  state court case *Hector Lopez v. Ricoh USA, Inc*., Case No. 18STCV08926, Los Angeles County

16  Superior Court, (Dkt. No. 37-2 at ¶ 10; *see also* Dkt. No. 27), which the Court granted, (Dkt. No.

17  28).  Plaintiff filed the second amended complaint on July 12, 2019, asserting the following

18  claims: (1) Failure to Pay Minimum Wages, Straight Time, and Overtime Compensation, Cal.

19  Lab. Code §§ 204, 210, 222, 223, 224, 510, 1194, 1197, 1197.1, 1198; (2) Failure to Provide Meal

20  Periods, Cal. Lab. Code §§ 226.7, 512; (3) Failure to Provide Rest Periods, Cal. Lab. Code §§

21  226.7; (4) Failure to Reimburse for Necessary Work Expenses, Cal. Lab. Code §§ 2800, 2802; (5)

22  Failure to Pay Wages Owed, Cal. Lab. Code §§ 201-203; (6) Failure to Furnish Accurate Itemized

23  Wage Statements, Cal. Lab. Code § 226, 226.3; (7) Failure to Maintain Accurate Records, Cal.

24  Lab. Code § 226(a), 1174; (8) Unfair Business Practices, Bus. & Prof. Code §§ 17200 *et seq.*

25  ("UCL claim"); (9) PAGA, Cal. Lab. Code §§ 2698 *et seq.*; (10) violations of the FLSA, 29

26  U.S.C. §§ 201 *et seq.*  (Dkt. No. 29 at 1-2.)  The second amended complaint is the operative

27

28  [9] Prior to filing the original complaint, Plaintiff submitted written notice of Ricoh's alleged wage-and-hour violations to the LWDA, in accordance with PAGA.  (Dkt. No. 45-1 at ¶ 3.)

complete for settlement purposes. (Dkt. No. 45-1 at ¶ 7.)

Plaintiff filed an unopposed motion for preliminary approval of the Settlement Agreement on October 3, 2019. (Dkt. No. 37.) Thereafter Ricoh sent notices to the United States Attorney General and the California Attorney General, pursuant to CAFA, 28 U.S.C. § 1715(b). (Dkt. No. 39 at ¶ 2; *see also* Dkt. Nos. 39-1 & 39-2, Exs. A-B.) On November 25, 2019, The Court granted Plaintiff's motion following oral argument on November 7 and Plaintiff's submission of supplemental briefing to address the Court's concerns regarding: the amount of funds designated for potential *cy pres* distribution; the opt-out language in the proposed class notice ("Notice"); and the ability of putative class members to object to Plaintiff's forthcoming motion for attorneys' fees. (Dkt. No. 43 at 3 (Preliminary Approval Order).) The Preliminary Approval Order appointed the Clark Law Group and United Employees Law Group as Class Counsel and directed them to file a motion for final approval and for attorneys' fees and costs by February 20, 2020. (*Id.* at 25-26.) Class Counsel did so. (*See* Dkt. No. 45.) The Order set the date for a final approval hearing on March 26, 2020, (Dkt. No. 43 at 26); the Court held the hearing as scheduled.

## DISCUSSION

A class action settlement must be fair, adequate, and reasonable. Fed. R. Civ. P. 23(e)(2). Where, as here, parties reach an agreement before class certification, "courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003). The approval of a class action settlement takes place in two stages. In the first stage of the approval process, the Court preliminarily approves the settlement pending a fairness hearing, temporarily certifies a settlement class, and authorizes notice to the class. *See Villegas v. J.P. Morgan Chase & Co.*, No. CV 09–00261 SBA (EMC), 2012 WL 5878390, at *5 (N.D. Cal. Nov. 21, 2012). Similarly, court approval is generally required for settlement of FLSA collective actions. *See Camilo v. Ozuna*, No. 18-cv-02842-VKD, 2019 WL 2141970, at *6 (N.D. Cal. May 16, 2019). The Court's Preliminary Approval Order granted conditional certification to both the class and FLSA collective, and preliminary approval of Settlement Agreement. (*See* Dkt. No. 43.)

At the second stage, "after notice is given to putative class members, the Court entertains

any of their objections to (1) the treatment of the litigation as a class action and/or (2) the terms of the settlement." *Ontiveros v. Zamora*, 303 F.R.D. 356, 363 (E.D. Cal. Oct. 8, 2014) (citing *Diaz v. Tr. Territory of Pac. Islands*, 876 F.2d 1401, 1408 (9th Cir. 1989)). Here, there are no objections. (*See* Dkt. No. 45-1 at ¶ 15.) Following the final fairness hearing, the Court must reach a final determination as to whether the parties should be allowed to settle the class action pursuant to their agreed upon terms. *See Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004).

## I.     Motion for Final Approval

### A.     Certification of the Settlement Class

Class actions must meet the following requirements for certification:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  In addition to meeting the requirements of Rule 23(a), a putative class action must also meet one of the conditions outlined in Rule 23(b)—as relevant here, the condition that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Prior to certifying the class, the Court must determine that Plaintiff has satisfied his burden of demonstrating that the proposed class satisfies each element of Rule 23.

#### 1.     Rule 23(a) Requirements

The Preliminary Approval Order found that the putative class satisfied the numerosity, commonality, typicality, and adequacy of representation requirements under Rule 23(a).  (Dkt. No. 43 at 11-12.)  Since that time, the Court is unaware of any developments that would change its analysis, and neither Plaintiff nor Defendants have indicated that such developments have occurred.  Further, nothing in the amended complaint changes the Court's previous analysis. Accordingly, the Rule 23(a) requirements are met.

United States District Court
Northern District of California

### 2.     Rule 23(b) Requirements

The Preliminary Approval Order likewise found that the prerequisites of Rule 23(b)(3) were satisfied.  (*Id.* at 12-14.)  The Court is unaware of any changes that would alter its analysis, and there was no indication in Plaintiff's papers or at the fairness hearing that any such developments had occurred.  Further, there were no objections by individual class members who claim to have an interest in controlling the prosecution of this action or related actions.  Accordingly, the Rule 23(b) requirements are met.

### 3.     Rule 23(c)(2) Notice Requirements

If the Court certifies a class under Rule 23(b)(3), it "must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).  Rule 23(c)(2) governs both the form and content of the notice.  *See Ravens v. Iftikar*, 174 F.R.D. 651, 658 (N.D. Cal. 1997).  Although the notice must be "reasonably certain to inform the absent members of the plaintiff class," Rule 23 does not require actual notice.  *Silber v. Mabon*, 18 F.3d 1449, 1454 (9th Cir. 1994) (internal quotation marks and citation omitted).

As noted in the Preliminary Approval Order, the notice requirements under Rule 23(c)(2)(B) are met here.  (*See* Dkt. No. 43 at 21-23.)  The Notice includes, among other information: a description of the lawsuit, including a brief overview of the claims in plain language; contact information for Plaintiff's counsel, Ricoh's Counsel, and the Claims Administrator; the terms of the settlement including a summary of the settlement amount, its distribution, and the methodology for calculating the individual settlement shares for both the class and collective action; and the release of claims.  (Dkt. No. 45-6, Ex. A.)  The Notice also informs class members of how to: (1) participate in both the class and collective actions; (2) opt-out of the Settlement Class by mailing a written "Request for Exclusion" to Claims Administrator within 45 days of the mailing of the Notice; (3) object to the settlement by mailing a timely written "Notice of Objection" or "Formal Objection" to the Court within 45 days of the mailing of the Notice; (4) obtain a copy of the Settlement Agreement; and (5) obtain a copy of Plaintiff's motion for attorneys' fees and costs and file a written objection to same.  (*Id.* at 12-15.)  Class

1    members are further notified that they may attend the final fairness hearing in person or through an

2    attorney but are not required to do so.  (*Id.* at 15-16.)

3         The Court is satisfied that the content of the Notice was sufficient under Rule 23(c)(2)(B).

4    *See Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566, 575 (9th Cir. 2004) ("Notice is

5    satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those

6    with adverse viewpoints to investigate and to come forward and be heard.") (internal quotation

7    marks and citation omitted).  Because the settlement class satisfies Rules 23(a) and 23(b)(3), and

8    notice was sufficient in accordance with Rule 23(c), the Court grants final class certification.

9              **B.      Certification of the FLSA Collective**

10        Under the FLSA, an employee may bring a "collective action" on behalf of other

11   "similarly situated" employees.  29 U.S.C. § 216(b); *Campbell v. City of Los Angeles*, 903 F.3d

12   1090, 1117 (9th Cir. 2018) (noting that a party plaintiff and putative collective members are

13   "similarly situated, and may proceed in a collective, to the extent they share a similar issue of law

14   or fact material to the disposition of their FLSA claims").  The Court's Preliminary Approval

15   Order granted conditional certification of the FLSA collective because Plaintiff made a plausible

16   showing that he was similarly situated to the putative collective members.  (*See* Dkt. No. 43 at 14-

17   15.)  There is nothing to suggest the Court was wrong on that score; thus, the Court grants

18   certification of the FLSA collective for settlement purposes.

19        "If the collective action members are similarly situated, most courts then evaluate the

20   settlement under the standard established by the Eleventh Circuit, which requires the settlement to

21   constitute a fair and reasonable resolution of a bona fide dispute."  *Otey v. CrowdFlower, Inc.*, No.

22   12-cv-05524, 2014 WL 1477630, at *3 n.5 (N.D. Cal. Apr. 15, 2014) (collecting cases) (internal

23   quotation marks and citation omitted).  "[T]he factors that courts consider when evaluating a

24   collective action settlement are essentially the same as those that courts consider when evaluating

25   a [class action] settlement" under Rule 23(e).  *See id.* at *11 (applying same fairness factors to

26   settlement involving FLSA collective and class action).  Thus, the Court will address the fairness

27   of the settlement as it pertains to both the class and collective actions using the same factors.

28   //

## C.    Final Approval of the Settlement

In determining whether a class action and FLSA collective settlement is fair, adequate, and reasonable, determination, courts generally consider the following factors: "(1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement." *Churchill*, 361 F.3d at 575; *see also Otey*, 2014 WL 1477630, at *4 (applying same factors to FLSA collective action settlement). "This list is not exclusive and different factors may predominate in different factual contexts." *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993). However, when "a settlement agreement is negotiated prior to formal class certification, consideration of these eight . . . factors alone is [insufficient]." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011). In such cases, courts must also ensure that the settlement did not result from collusion among the parties. *Id.* at 946-47.

As discussed below, a review of the fairness and *Bluetooth* factors indicates that the settlement is fair, adequate, and reasonable.

### 1.    The Fairness Factors

#### a. Strength of Plaintiff's Case and Risk, Expense, Complexity, and Likely Duration of Further Litigation

The Court first considers "the strength of [Plaintiff's] case on the merits balanced against the amount offered in the settlement." *See DIRECTV, Inc.*, 221 F.R.D. at 526 (internal quotation marks and citation omitted). Although this action reached settlement before the Court had occasion to consider the merits of Plaintiff's claims, the Court need not reach an ultimate conclusion about the merits of the dispute now, "for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982). To that end, there is no "particular formula by which th[e] outcome must be tested."

13

1    *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009).  Rather, the Court's assessment

2    of the likelihood of success is "nothing more than an amalgam of delicate balancing, gross

3    approximations and rough justice."  *Id.* (internal quotation marks and citation omitted).  "In

4    reality, parties, counsel, mediators, and district judges naturally arrive at a reasonable range for

5    settlement by considering the likelihood of a plaintiffs' or defense verdict, the potential recovery,

6    and the chances of obtaining it, discounted to a present value."  *Id.*

7         Here, the second amended complaint alleges multiple Labor Code violations and claims

8    under the UCL and PAGA.  (*See generally* Dkt. No. 29.)  Although Plaintiffs believe their claims

9    are meritorious, Class Counsel Mr. Clark attests to Defendants' specific arguments and potential

10   defenses regarding the meal and rest break, minimum wage, overtime, and reimbursement claims.

11   (*See* Dkt. No. 42-1 at ¶¶ 10-14.)  Indeed, the Agreement itself asserts that Defendants believe their

12   defenses have merit.  (*See* Dkt. No. 37-1 at ¶ 9.)  Further, Mr. Clark attests that Defendants have

13   maintained that class treatment of this case is unmanageable because Defendants "contend that

14   individualized inquiries pertaining to each putative class member's experience would

15   predominate."  (Dkt. No. 42-1 at ¶ 10.)

16        In determining the estimated value of Plaintiff's claims and reaching the Agreement, Class

17   Counsel considered Defendants' asserted defenses and the evidence obtained through discovery

18   regarding the challenged employment practices.  (*Id.* at ¶¶ 15-16.)  Class Counsel devalued the

19   unpaid wages claim because it "would require an extensive expert analysis and testimony" and

20   "[t]he time and expense of such inquiry would potentially outweigh the benefits to the Settlement

21   Class."  (*Id.* at ¶ 16.)  Further, Class Counsel devalued the meal and rest break claims because

22   resolving those claims "potentially lends itself to individualized inquiries."  (*Id.*)  Class Counsel

23   also applied "minimal value for Plaintiff's reimbursement claims" because the claims had "little

24   merit" in light of Defendants' automobile reimbursement policy and a lack of "evidence that

25   Defendants required putative class members to use their personal devices or purchase Ricoh

26   branded shirts."  (*Id.*)

27        Given the risks and costs of continued litigation, the immediate reward to class members

28   through settlement is preferable.  The average class member payout is $1,536.06 and the highest

payout is $2,835.85.  The benefit of receiving this money now rather than later at some unidentified and uncertain time has its own value.  Thus, the challenges Plaintiff would face should this case move forward instead of settling, in contrast to the finality and speed of recovery under the Agreement, weighs in favor of approving the settlement.

### b.  Risk of Maintaining Class Action Status Throughout Trial

In considering the third factor, the Court looks to the risk of maintaining class certification if the litigation were to proceed.  As discussed above, Class Counsel attests that Defendants have set forth specific defenses regarding the meal and rest break, minimum wage, overtime, and reimbursement claims and maintained that individual issues predominate to defeat class treatment. (*See* Dkt. No. 42-1 at ¶¶ 10-16.)  Plaintiff asserts that "maintaining certification through trial would be both difficult and expensive" given Defendants' asserted defenses and their "aggressive[ ]" representations throughout this litigation that they will "oppose any motion for class certification."  (Dkt. No. 45 at 19-20.)  In light of Defendants' defenses and the size of the class, the Court agrees that certifying the 991-member class presents difficulties—both financial and on the merits—that weigh in favor of approving the settlement.

### c.  Settlement Amount

The fourth fairness factor, the amount of recovery offered, also favors final approval of the settlement.  When considering the fairness and adequacy of the amount offered in settlement, "it is the complete package taken as a whole, rather than the individual component parts, that must be examined for overall fairness."  *DIRECTV, Inc.*, 221 F.R.D. at 527.  "[I]t is well-settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial."  *Id.* (collecting cases).

The Claims Administrator estimates that the Net Settlement Amount is approximately $1,465,694.96 after deducting attorneys' fees and litigation costs, Plaintiff's service award, settlement administration fees, payment to LWDA, and payment of the FLSA collective awards from the Gross Settlement Amount of $2,200,000.  (Dkt. No. 47 at ¶ 12.)  The Claims Administrator further estimates that the average individual settlement award is $1,536.06.  (*Id.* at ¶ 13.)  Class Counsel attests that the estimated value of all claims in this action is "approximately

$20,285,268.80." (Dkt. No. 42-1 at ¶ 9.)  Thus, the Gross Settlement Amount reflects an approximate 10.85% recovery and the Net Settlement Amount reflects an approximate 7% recovery of the estimated damages.  In granting preliminary approval the Court concluded that the estimated payout to class members was fair in relation to the risks of continued litigation, (*see* Dkt. No. 43 at 19-21), and there is nothing in the final approval materials that changes the Court's analysis on that score.

Finally, only one class member has opted out of the settlement.  Thus, that "the overwhelming majority of the class willingly approved the offer and stayed in the class presents at least some objective positive commentary as to its fairness."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).  The Court therefore concludes that the amount offered in settlement also weighs in favor of final approval.

### d. Extent of Discovery Completed and Stage of Proceedings

In the context of class action settlements, as long as the parties have sufficient information to make an informed decision about settlement, "formal discovery is not a necessary ticket to the bargaining table."  *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998).  Rather, a court's focus is on whether "the parties carefully investigated the claims before reaching a resolution."  *Ontiveros*, 303 F.R.D. at 371.  The Court's Preliminary Approval Order discussed Class Counsel's investigation of Plaintiff's claims, including witness interviews, exchanging formal discovery with Defendants and reviewing hundreds of pages of documents, exchanging additional documents in preparation for private mediation, engaging in private mediation with an experienced mediator, negotiating with Defendants, and considering Defendants' asserted defenses and the value of Plaintiff's claims.  (Dkt. No. 43 at 16-18.)  The Court determined that "there is no indication that Plaintiff rushed into settlement or was otherwise ill-informed about the case and could not 'reasonably assess its strengths and value.'"  (*Id.* at 18 (quoting *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 396 (C.D. Cal. May 31, 2007)).)  The Court affirms that preliminary determination.

After Plaintiff filed the FAC in October 2018, the parties engaged in an initial round of

discovery in which Plaintiff propounded 11 interrogatories and 9 requests for production of documents, and Defendants propounded 4 interrogatories and 43 requests for production of documents. (Dkt. No. 45-1 at ¶ 5.) The parties then "exchange[d] additional information and documents in advance of mediation" with an experienced mediator in March 2019. (*Id.* at ¶ 6.) During the mediation the parties discussed their "respective positions on the legal and factual issues" in the case and Defendants' potential liability. (*Id.*) Class Counsel Mr. R. Craig Clark attests that in reaching the proposed settlement, counsel considered, among other things:

> the information and documents obtained in the course of the Action; Defendants' defenses including, but not limited to, perceived adequacy of its written policies; Defendants' contention that putative class members are alone in the field and Defendants' alleged rounding policy and practice; the experience of the named Plaintiff and other percipient witnesses; the size of the class/collective; the uncertain outcome and risks of litigating complex actions, such as achieving and maintaining class certification and addressing manageability issues; issues of proof; the time and expense of litigating the case through trial; the unsettled law as to whether the PAGA permits for the recovery of unpaid wages, as well as the discretionary nature of PAGA civil penalties; and the non-reversionary nature of the settlement.

(Dkt. No. 42-1 at ¶ 15; *see also id.* at ¶¶ 6-14 (attesting to extent of investigation and discovery, valuation of Plaintiff's claims, and Defendants' asserted defenses).) Further, since Defendants removed this action to federal court the parties have filed six joint case management conference statements, (*see* Dkt. Nos. 11, 20, 23, 25, 32, 34), and participated in a case management conference before the undersigned, (*see* Dkt. No. 12). Under these circumstances, the Court is satisfied that the parties carefully investigated the claims at issue and had sufficient information to make an informed decision about settling the case. Thus, the extent of discovery and stage of proceedings support approval of the settlement.

### e. Experience and Views of Counsel

The experience and views of counsel also weigh in favor of approving the settlement. Class Counsel Mr. Clark, principal of the Clark Law Group, attests that his firm has 15 years of experience litigating class, collective, and representative actions and complex commercial matters, and his firm has handled "well over 150" such matters. (Dkt. No. 37-2 at ¶ 58; *see also* 37-2, Ex. 2.) Mr. Clark served as co-lead counsel in a California wage-and-hour class action in which the

plaintiffs obtained a settlement of $27,500,000 on behalf of over 28,000 class members. (*Id.*) The Clark Law Group also served as class counsel in a California wage-and-hour class action in which the plaintiff obtained a settlement of $2,750,000 on behalf of 364 class members. (*Id.*) Mr. Clark attests that he believes "the settlement is fair, reasonable and adequate and is in the best interest of all members of the Settlement Class and the FLSA Collective in light of all known facts and circumstances" of the case. (Dkt. No. 37-2 at ¶ 59.)

Class Counsel Walter L. Haines, principal of the United Employees Law Group, attests that he has nearly four decades of litigation experience and has represented clients in over 300 "class actions with settlements totaling over $400,000,000." (Dkt. No. 45-4 at ¶ 4.) Mr. Haines further attests that he believes "the settlement is fair, adequate and reasonable," based on his "extensive experience" and consideration of the circumstances of the case. (Dkt. No. 37-3 at ¶ 6.)

Class Counsel attest that they thoroughly investigated Plaintiff's claims, exchanged extensive discovery with Defendants, and engaged in private mediation before reaching a settlement that they believe is fair and reasonable to the class given the legal uncertainties underlying Plaintiff's claims and risks of continued litigation. (*See* Dkt. Nos. 37-2 at ¶¶ 52-57 & 37-3 at ¶¶ 4-6.) Class Counsel's experience in California wage-and-hour litigation and their assertion that the settlement is fair, adequate, and reasonable supports final approval of the settlement. *See Hanlon*, 150 F.3d at 1026; *see also DIRECTV, Inc.*, 221 F.R.D. at 528 ("Great weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation.") (internal quotation marks and citation omitted).

### f. Presence of a Government Participant

No government entity is a party to this action; however, because Defendant removed this case pursuant to CAFA, it was required to provide notice of the proposed settlement to the relevant state and federal officials pursuant to 28 U.S.C. § 1715(b). *See Chan Healthcare Grp., PS v. Liberty Mut. Fire Ins. Co.*, 844 F.3d 1133, n.2 ("In addition to §§ 1332(d) and 1453, CAFA also includes §§ 1711-1715, which relate to approval of settlements in class actions."). Defendant did so on October 18, 2019. (*See* Dkt. No. 39 at ¶ 2; *see also* Dkt. Nos. 39-1 & 39-2, Exs. A-B.) Further, Plaintiff submitted written notice of Ricoh's alleged wage-and-hour violations to the

California Labor and Workforce Development Agency ("LWDA") on March 7, 2018, in accordance with PAGA. (Dkt. No. 45-1 at ¶ 3.) As of the final approval hearing, no government entity had raised an objection to the proposed settlement.

### g. Reaction of Class Members

As previously discussed, the Claims Administrator attests that 991 class members were mailed notice of the settlement, and notice was ultimately unsuccessful as to 12 class members. (*See* Dkt. No. 45-6 at ¶¶ 7, 11.) As of the final approval hearing, only one class member opted out of the settlement and the Court received no objections concerning the settlement or Plaintiff's motion for attorneys' fees. "Courts have repeatedly recognized that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *Garner v. State Farm Mut. Auto. Ins. Co.*, No. CV 08 1365 CW (EMC), 2010 WL 1687832, at *14 (N.D. Cal. Apr. 22, 2010) (internal quotation marks and citation omitted). Thus, the Court "may appropriately infer that a class action settlement is fair, adequate, and reasonable when few class members object to it." *Id.* (internal quotation marks and citation omitted).

In sum, the fairness factors weigh in favor of granting Plaintiff's motion for final approval of the class action settlement.

### 2. The *Bluetooth* Factors

Given that the parties settled prior to class certification, the Court must look beyond the *Churchill* factors and examine the settlement for evidence of collusion with an even higher level of scrutiny. *See Bluetooth*, 654 F.3d at 946. The question here is whether the settlement was the result of good faith, arms-length negotiations or fraud and collusion. *See id.* In determining whether the settlement is the result of collusion, courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interest and that of certain class members to infect the negotiations." *Id.* at 947. The Ninth Circuit has identified three such signs:

> (1) when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded;

19

(2) when the parties negotiate a "clear sailing" arrangement providing for the payment of attorneys' fees separate and apart from class funds, which carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class; and

(3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund.

*Id.* at 947 (internal quotation marks and citations omitted).

Here, one of the three warning signs that the Ninth Circuit identified is present—a "clear sailing" provision in the Settlement Agreement. However, for the reasons described below the Court finds no evidence of collusion, despite the existence of the clear sailing provision. *See id.* at 950 (noting that upon remand the district court may uphold the settlement notwithstanding the presence of all three of the *Bluetooth* warning signs).

First, the Court compares the payout to the class—the Net Settlement Amount—to Class Counsels' unopposed fees under the Settlement Agreement. *See Harris v. Vector Mktg. Corp.*, No C-08-5198 EMC, 2011 WL 4831157, at *6 (N.D. Cal. Oct. 12, 2011) (examining "whether a disproportionate part of the settlement is being awarded to class counsel" under the settlement agreement). The Settlement Agreement provides for a maximum award of $733,333.33 in attorneys' fees (33% of the Gross Settlement Amount of $2,200,000). (Dkt. No. 37-1 at ¶ 62(d).) However, Plaintiffs' motion for attorneys' fees requests less than that amount—$550,000 (25% of the Gross Settlement Amount). The Ninth Circuit has identified 25% of the total settlement as a reasonable benchmark for attorneys' fees, *see Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000), and the Court concludes that the amount requested is not disproportionate to, and is indeed less than, the actual Net Settlement Amount, which will exceed $1,465,000. Accordingly, the amount of Class Counsels' award relative to the payout to the class does not evince collusion.

The second warning sign—a clear sailing provision—is present: the Settlement Agreement provides that Defendant will not oppose an award to Class Counsel of $733,333.33 in attorneys' fees, to be paid from the Gross Settlement Amount. (*See* Dkt. No. 37-1 at ¶ 62(d).) "[T]he very existence of a clear sailing provision increases the likelihood that class counsel will have bargained away something of value to the class." *Bluetooth*, 654 F.3d at 948 (alteration in original) (internal quotation marks and citation omitted). Thus, the Court "has a heightened duty

to peer into the provision and scrutinize closely the relationship between attorneys' fees and benefit to the class, being careful to avoid unreasonably high fees simply because they are uncontested." *Id.* (internal quotation marks and citation omitted). The Court concludes that the existence of the clear sailing provision on its own does not evince collusion, because the fees awarded are not "unreasonably high," but instead fail within the 25% benchmark established by the Ninth Circuit. Further, the fees are not disproportionate to the class payout.

Finally, the third warning sign—whether the parties have arranged for fees not awarded to the class to revert to defendants rather than be added to the class fund, *see Bluetooth,* 654 F.3d at 948—is not present here. Instead, the non-reversionary Settlement Agreement provides that any fees not awarded become part of the Net Settlement Amount to be distributed to class members. (*See* Dkt. No. 37-1 at ¶ 62(d) ("If the amounts awarded by the Court are less than the amounts requested by Class Counsel, the difference shall be included in the Net Settlement Amount.).)

Notwithstanding the existence of the clear sailing provision, the Court finds that the settlement did not result from, and was not influenced by, collusion. First, the Settlement Agreement adequately satisfies the class members' claims, which is reflected in part by the existence of only one opt-out and no objections to the settlement. Second, the Court finds no evidence of explicit collusion here, where the parties exchanged discovery and engaged in settlement discussions overseen by an experienced neutral mediator before agreeing on this settlement. Class Counsel attests that "[a]t all times, the Parties' negotiations were adversarial, non-collusive and at arm's length." (Dkt. No. 45-1 at ¶ 6.) Based on the nature of the mediation process and the parties' conduct during this litigation, the Court is satisfied that the Settlement Agreement is the product of serious, informed, non-collusive negotiations.

\*\*\*

In sum, the eight fairness factors suggest that the settlement is fair, adequate and reasonable, and the Court is satisfied that the settlement was not the result of collusion between the parties. Accordingly, the Court grants final approval of the Settlement Agreement.

**II.     Motion for Attorneys' Fees, Costs, and Class Representative Service Award**

As previously discussed, the Settlement Agreement provides for a maximum of

$733,333.33 (one-third of the Gross Settlement Amount) to cover Class Counsel's attorneys' fees. (Dkt. No. 37-1 at ¶ 62(d).)  The Settlement Agreement further provides for reimbursement of Class Counsel's litigation expenses, up to $15,000.  (*Id.*)  Finally, the Settlement Agreement provides that the named Plaintiff will receive a $10,000 "Service Award" for his time and effort in prosecuting this lawsuit.  (*Id.* at ¶ 62(c).)  The Court addresses in turn Plaintiff's motion for attorneys' fees, litigation costs, and service award.

### A.    Attorneys' Fees

"While attorneys' fees and costs may be awarded in a certified class action where so authorized by law or the parties' agreement, Fed. R. Civ. Pro. 23(h), courts have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *Bluetooth*, 654 F.3d at 941.  In diversity actions such as this, state law applies to determine the right to fees and the method for calculating them. *See Mangold v. California Pub. Utils. Comm'n*, 67 F.3d 1470, 1478-79 (9th Cir. 1995).  Because Plaintiff's underlying claims are state law claims, the Court must apply California law on attorneys' fees. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002).

The California Supreme Court has held that courts have discretion to choose among two different methods for calculating a reasonable attorney's fee award. *See Laffitte v. Robert Half Int'l Inc.*, 1 Cal. 5th 480, 504 (2016).  The first is the "percentage method," where the fee is calculated "as a percentage share of a recovered common fund or the monetary value of [the] plaintiffs' recovery." *Id.* at 489.  The second approach is "[t]he lodestar method, or more accurately the lodestar–multiplier method." *Id.* at 489.  Under the lodestar method, the fee is calculated "by multiplying the number of hours reasonably expended by counsel by a reasonable hourly rate," then "increas[ing] or decreas[ing]" the lodestar figure based on "a variety of . . . factors, including the quality of the representation, the novelty and complexity of the issues, the results obtained, and the contingent risk presented." *Id.* (citation omitted).  "The choice of a fee calculation method is generally one within the discretion of the trial court, the goal under either the percentage or lodestar approach being the award of a reasonable fee to compensate counsel for their efforts." *Id.* at 504.  This approach aligns with the Ninth Circuit. *See Vizcaino*, 290 F.3d at

1047 ("Under Ninth Circuit law, the district court has discretion in common fund cases to choose either the percentage-of-the-fund or the lodestar method.").

Both the California Supreme Court and the Ninth Circuit recommend that whether a court uses the lodestar or percentage-of-recovery method, the court should perform a cross-check using the other method to confirm the reasonableness of the fee (e.g., if the percentage-of-recovery method is applied, a cross-check with the lodestar method will reveal if the amount requested is unreasonable in light of the amount of work done). *See, e.g., Bluetooth*, 654 F.3d at 944-45; *Laffitte*, 1 Cal. 5th at 504 ("A lodestar cross-check . . . provides a mechanism for bringing an objective measure of the work performed into the calculation of a reasonable attorney fee.").

### 1.  Percentage-of-Recovery Method

Plaintiffs request $550,000 in fees, representing 25% of the $2.2 million Gross Settlement Amount and less than the $733,333.33 provided for under the Agreement.  Defendants do not oppose the request; nor has the Court received any objections from class members regarding Plaintiff's motion for attorneys' fees.  The 25% figure aligns with the benchmark established by the Ninth Circuit "for attorneys' fees calculations under the percentage-of-recovery approach." *Powers*, 229 F.3d at 1256.  However, the Court cannot simply apply the benchmark rate but must instead consider "all of the circumstances of the case" to determine whether it is appropriate. *See Vizcaino*, 290 F.3d at 1048 ("[C]ourts cannot rationally apply any particular percentage—whether 13.6 percent, 25 percent or any other number—in the abstract, without reference to all the circumstances of the case.") (internal quotation marks and citation omitted).  Relevant circumstances include: the results achieved for the class; the risks of litigation; and counsel's financial burden in litigating the case (i.e., contingent fee agreement and time and expense). *Id.* at 1048-50.  Here, the circumstances of the case support applying the benchmark figure.

### a.  Results Achieved

Class Counsel negotiated a non-reversionary settlement of $2,200,000 for the benefit of 991 class members.  The Net Settlement Amount from which class members will be paid, assuming the Court approves all requested awards in full, is $1,465,694.96.  The Claims Administrator attests that the average class member payout is $1,536.06 and the highest payout is

$2,835.85. In light of Class Counsel's explanation as to the valuation of Plaintiff's claims in light of Defendants' asserted defenses and the evidence obtained through discovery, the Court concludes that the results achieved support the requested award. The Court's determination is further supported by the lack of any objections to the settlement amount or the requested attorneys' fees. *See DIRECTV*, 221 F.R.D. at 529 ("It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members.") (collecting cases).

### b. Risks of Litigation

As previously discussed, there were significant risks in proceeding with litigation on the merits of Plaintiff's claims based on Defendants' asserted defenses, evidence regarding Defendants' employment policies, and the likelihood that individual issues would defeat class certification. Further, Mr. Clark attests that Class Counsel accepted this case "on a purely contingent basis with all of the associated risk factors inherent to such an undertaking, such as the lack of guarantee that any fees or litigation costs would ever be recovered." (Dkt. No. 45-1 at ¶ 17.) The significant risks associated with continued litigation combined with the contingent nature of the fee agreement in this case support application of the benchmark award.

### c. Counsel's Financial Burden

Class Counsel Mr. Clark attests that both the Clark Law Group and United Employees Law Group are "small firms, consisting of only 2 to 4 attorneys, and were thus precluded from taking other fee generating employment." (Dkt. No. 45-1 at ¶ 17.) Further, Mr. Clark attests that "Class Counsel has not been compensated for any of its time or expenses incurred since [initiating this action] in May 2018." (*Id.*) Because Class Counsel has expended significant time and resources on this action with no guarantee that it would be compensated for doing so, the requested award is appropriate.

In sum, the requested award is reasonable and warranted based on the circumstances of the case. The lodestar cross-check, with a reasonable multiplier, also demonstrates that a 25% award is reasonable in this case. *See Laffitte,* 1 Cal. 5th at 504 ("[T]he goal under either the percentage

1    or lodestar approach [is] the award of a reasonable fee to compensate counsel for their efforts.").

2                    **2.**        **Lodestar Cross-Check**

3          The lodestar figure consists of "the number of hours reasonably expended multiplied by

4    the reasonable hourly rate." *PLCM Grp. v. Drexler*, 22 Cal. 4th 1084, 1095 (2000). A reasonable

5    hourly rate is defined as "that prevailing in the community for similar work." *Id.* As to the

6    computation of hours, courts determining the lodestar ordinarily "must carefully review attorney

7    documentation of hours expended," *Ketchum v. Moses*, 24 Cal. 4th 1122, 1132 (2001), and

8    "[w]here the documentation of hours in inadequate, the district court may reduce hours

9    accordingly," *Hensley v. Eckerhart,* 461 U.S. 424, 433 (1983).

10         When the lodestar is used as a cross-check, however, courts "have generally not been

11   required to closely scrutinize each claimed attorney-hour, but have instead used information on

12   attorney time spent to focus on the general question of whether the fee award appropriately

13   reflects the degree of time and effort expended by the attorneys." *Laffitte*, 1 Cal. 5th at 505; *see*

14   *also Barbosa v. Cargill Meat Solutions Corp.*, 297 F.R.D. 431, 451 (E.D. Cal. 2013) ("Where the

15   lodestar method is used as a cross-check to the percentage method, it can be performed with a less

16   exhaustive cataloguing and review of counsel's hours."). Thus, courts performing a cross-check

17   may use "counsel declarations summarizing overall time spent, rather than demanding and

18   scrutinizing daily time sheets in which the work performed was broken down by individual task."

19   *Laffitte*, 1 Cal. 5th at 505. "Of course, trial courts retain the discretion to consider detailed time

20   sheets as part of a lodestar calculation, even when performed as a cross-check on a percentage

21   calculation." *Id.*

22                        **a.  Reasonable Hourly Rates**

23         To determine whether Class Counsel's hourly rates are reasonable, the Court looks to the

24   "hourly amount to which attorneys of like skill in the area would typically be entitled." *Ketchum*,

25   24 Cal. 4th at 1133. "The fee applicant has the burden of producing satisfactory evidence, in

26   addition to the affidavits of its counsel, that the requested rates are in line with those prevailing in

27   the community for similar services of lawyers of reasonably comparable skill and reputation."

28   *Jordan v. Multnomah Cty.*, 815 F.2d 1258, 1263 (9th Cir.1987). In addition, Civil Local Rule 54-

5(b)(3) requires the party seeking fees to submit "[a] brief description of relevant qualifications and experience and a statement of the customary hourly charges of each such person or of comparable prevailing hourly rates or other indication of value of the services."

Class Counsel Mr. Clark is the principal of the Clark Law Group. (Dkt. No. 45-1 at ¶ 1.) He has over three decades of litigation experience, (Dkt. No. 37-2, Ex. 2 at 21), and the Clark Law Group has 15 years of experience litigating class, collective, and representative actions and complex commercial matters, (Dkt. No. 37-2 at ¶ 58). Mr. Clark's standard litigation rate is $800 per hour. (Dkt. No. 45-1 at ¶ 20.) Clark Law Group attorneys Monique R. Rodriguez (California Bar admission 2015), Andrea Torres-Figueroa (California Bar admission 2017), and Paige D. Chretien (California Bar admission 2018) also worked on this case with hourly rates of $475, $415, and $395 per hour, respectively. (*See* Dkt. No. 45-2, Ex. 1 at 2.) Clark Law Group paralegal Andrea Gorrino billed an hourly rate of $205 per hour. (*Id.*)

Mr. Haines is the principal of United Employees Law Group. (Dkt. No. 45-4 at ¶ 1.) He has nearly four decades of experience litigating class actions. (*Id.* at ¶¶ 4.) His standard rate "is $675 per hour." (*Id.* at ¶ 7.)

These billing rates are reasonable and in line with prevailing rates in this district for lawyers of comparable experience and skill. *See, e.g., In re Magsafe Apple Power Adapter Litig.*, No. 5:09-CV-01911-EJD, 2015 WL 428105, at *12 (N.D. Cal. Jan. 30, 2015) ("In the Bay Area, reasonable hourly rates for partners range from $560 to $800, for associates from $285 to $510, and for paralegals and litigation support staff from $150 to $240.") (collecting cases).

### b. Hours Expended

Mr. Clark attests that the Clark Law Group expended 1,122.60 hours on this case, with the following breakdown: Mr. Clark (151.30 hours); Ms. Rodriguez (342.40 hours); Ms. Torres-Figueroa (55.00 hours); Ms. Chretien (414.60 hours); and Ms. Gorrino (159.30 hours). (Dkt. No. 45-1 at ¶ 22; *see also* Dkt. No. 45-2, Ex. 1 at 2.) In support, Mr. Clark submits time entries for specific tasks between December 20, 2017 and February 18, 2020. (*See* Dkt. No. 45-2, Ex. 2.) The invoices are sufficiently detailed and for the most part reflect hours that the Clark Law Group reasonably expended on behalf of Plaintiff. However, even without closely scrutinizing the

invoices it is apparent that they are riddled with redundant entries; for example: there are multiple entries for intra-firm meetings where all attorneys in attendance billed separately for that time; individual attorneys separately billed for reviewing the same email (for the same amount of time); etc. (*See generally id.*)  The entries also contain multiple instances of block-billing.  Simply put, the billing entries do not reflect sound billing judgment and instead appear to pad the hours expended to closely align with the 25% benchmark.  *See Hensley*, 461 U.S. at 434 (noting that counsel "should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary"); *see also Ketchum*, 24 Cal. 4th at 1132 ("'[P]adding' in the form of inefficient or duplicative efforts is not subject to compensation.").  Accordingly, the Court reduces the hours expended by Mr. Clark personally by 20% to reflect the duplicative and block-billed entries, and in recognition of Mr. Clark's position as principal of the Clark Law Group and individual responsible for the billing entries.

Mr. Haines attests that United Employees Law Group expended 37.50 hours on this case. (Dkt. No. 45-4 at ¶ 6.)  Mr. Haines did not submit actual billing entries in support of that statement, and instead attests that his firm expended 6.50 hours on the "[i]nitial investigation, case evaluation [and] research"; 25.50 hours on "[d]iscussions with co-counsel on key issues, discovery, strategy and mediation"; and 5.70 hours on "review[ing] communications, pleadings, motions and settlement documents." (*Id.*)  Mr. Haines' declaration is sufficient for purposes of the lodestar cross-check, and his summaries are not unreasonable on their face.  *See Laffitte*, 1 Cal. 5th at 505 (noting that courts performing a cross-check may appropriately consider "declarations summarizing overall time spent, rather than demanding and scrutinizing daily time sheets in which the work performed was broken down by individual task").

### c. Lodestar Calculation

Based on Class Counsel's declarations and billing entries, the Court calculates the lodestar as $504,033.00 based on 1,129.80 hours expended, as follows:

| Attorney | Hourly Rate | Hours Expended |
| --- | --- | --- |
| Mr. Clark | $800 | 121.04 |
| Mr. Haines | $675 | 37.50 |

| | | |
|---|---|---|
| Ms. Rodriguez | $475 | 342.40 |
| Ms. Torres-Figueroa | $415 | 55.00 |
| Ms. Chretien | $395 | 414.60 |
| Ms. Gorrino | $205 | 159.30 |

Courts retain discretion to apply a positive or negative enhancement, or "multiplier" to the lodestar where appropriate. *See Ketchum*, 24 Cal. 4th at 1132 (noting that the lodestar may be adjusted based on factors including "(1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, [and] (4) the contingent nature of the fee award"); *see also Bluetooth*, 654 F.3d at 942 (noting that a lodestar may be adjusted "upward or downward by an appropriate positive or negative multiplier reflecting a host of reasonableness factors, including the quality of the representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment") (internal quotation marks and citation omitted). The multiplier is calculated by dividing the percentage fee award by the lodestar calculation. *Fischel v. Equitable Life Assur. Society of U.S.*, 307 F.3d 997, 1008 (9th Cir. 2002). Here, a multiplier of 1.09 is calculated by dividing $550,000 by $504,033.

As to the first two factors noted in *Ketchum*, the California Supreme Court cautioned that "the difficulty of a legal question and the quality of representation are already encompassed in the lodestar." *See Ketchum*, 24 Cal. 4th at 1138-39 ("A more difficult legal question typically requires more attorney hours, and a more skillful and experienced attorney will command a higher hourly rate."). Here, notwithstanding the inherent difficulty in prosecuting a case involving 10 federal and state wage-and-hour claims with 991 class members, there is no indication that the wage-and-hour issues were novel or that Class Counsel exhibited "exceptional representation" by "exceed[ing] the quality of representation that would have been provided by an attorney of comparable skill and experience billing at the hourly rate used in the lodestar calculation." *See id.* at 1139. However, "the extent to which the nature of the litigation precluded other employment" by Class Counsel and "the contingent nature of the fee award" warrant a positive multiplier. *See id.* at 1132.

As previously discussed, Mr. Clark attests that:

> Class Counsel prosecuted this Action on a purely contingent basis with all of the associated risk factors inherent to such an undertaking, such as the lack of guarantee that any fees or litigation costs would ever be recovered. This Action occupied a significant portion of Class Counsel's time and resources as Class Counsel are both small firms, consisting of only 2 to 4 attorneys, and were thus precluded from taking other fee generating employment. Class Counsel has not been compensated for any of its time or expenses incurred since this Action began in May 2018.

(Dkt. No. 45-1 at ¶ 17.) In light of this testimony, a positive multiplier is warranted.

Awarding the fees requested here—$550,000—would result in a multiplier of 1.09. Such an enhancement is reasonable and well within the normal range of multipliers. *See Laffitte*, 1 Cal. 5th at 488 (affirming trial court's award where it "cross-check[ed] the reasonableness of the percentage award by a calculating a lodestar fee and approving a multiplier over lodestar of 2.03 to 2.13"). The Ninth Circuit has recognized that multipliers generally range from one to four. *See Vizcaino*, 290 F.3d at 1051 n.6.

Accordingly, the Court awards Class Counsel its requested fees of $550,000, reflecting 25% of the Gross Settlement Amount.

### B.    Litigation Costs

"There is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of reasonable litigation expenses from that fund." *Ontiveros*, 303 F.R.D. at 375 (citations omitted). To that end, district courts in the Ninth Circuit regularly award litigation costs and expenses—including reasonable travel expenses—in wage-and-hour class actions. *See, e.g., Nwabueze v. AT&T Inc.*, No. C 09-01529 SI, 2014 WL 324262, at *2 (N.D. Cal. Jan. 29, 2014); *LaGarde v. Support.com, Inc.*, No. C12-0609 JSC, 2013 WL 1283325, at *13 (N.D. Cal. Mar. 26, 2013). Here, Plaintiff requests a total of $14,305.04 in litigation costs representing litigation expenses through February 20, 2020 and estimated future costs. (Dkt. No. 45 at 32.) In support of that request Plaintiff submits the declaration of Mr. Clark, who attests to the amount requested by the Clark Law Group ($13,784.92) and submits a summary of costs. (*See* Dkt. Nos. 45-1 at ¶ 25 & 45-1, Ex. 2 at 10). Plaintiff also submits the declaration of Mr. Haines, who attests that United Employees Law Group "has incurred $20.12 in litigation expenses,"

United States District Court
Northern District of California

including "court costs, legal research, litigation support and other miscellaneous expenses (i.e., photocopying, telephone and postage)." (Dkt. No. 45-4 at ¶ 9.)

The Clark Law Group's summary of costs itemizes the expenses it incurred, including $6,000 for private mediation, totaling $14,284.92. (*See id.* at 3, 6.) Some of the costs are questionable. For example, Mr. Clark billed $147.97 for a hotel room at "Hotel Indigo for Mediation" on March 19, 2019, and Ms. Rodriguez billed $313.98 for a hotel room at the same location on the same date, with no explanation for Ms. Rodriguez's significantly higher rate. (*See id.* at 4.) Further, Mr. Clark and Ms. Rodriguez billed $139.55 for lunch on March 18, 2019 when traveling for mediation. (*Id.*) Ms. Rodriguez also billed $620.45 for hotel room at Hotel Fusion in San Francisco while traveling for the preliminary approval hearing. (*Id.* at 5.) The lunch and Hotel Fusion costs appear excessive. Plaintiff's request for costs also includes $500.00 for future "[f]iling fees, courier fees, travel, food and lodging expenses and other miscellaneous costs." (Dkt. No. 45-1 at ¶ 25.) To the extent the future costs were tethered to the final approval hearing, the hearing was vacated in light of the COVID-19 pandemic.

Thus, the Court deducts $662.00 from the Clark Law Group's requested costs. This amount reflects a 50% reduction in the unexplained, excessive lodging and meal expenses noted above, as well as a 75% reduction in the requested "future" fees. Accordingly, the Court awards Plaintiff $13,643.04 in costs.

### C. Plaintiff's Service Award

Service or "[i]ncentive *awards* are fairly typical in class action cases." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009) (distinguishing incentive awards from incentive agreements, the latter of which are "entered into as part of the initial retention of counsel" and "put class counsel and the contracting class representatives into a conflict position from day one"). However, the decision to approve such an award is a matter within the Court's discretion. *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000). Service awards "are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputation risk undertaken in bringing the action, and, sometimes to recognize their willingness to act as a private attorney general." *Rodriguez*, 563 F.3d at 958-59. Although service awards are

viewed more favorably than incentive agreements, excessive awards "may put the class representative in a conflict with the class and present a considerable danger of individuals bringing cases as class actions principally to increase their own leverage to attain a remunerative settlement for themselves and then trading on that leverage in the course of negotiations." *Id.* at 960 (internal quotation marks and citation omitted). Thus, "district courts must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives." *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1164 (9th Cir. 2013).

In determining whether a service award is reasonable, courts generally consider:

> (1) the risk to the class representative in commencing a suit, both financial and otherwise; (2) the notoriety and personal difficulties encountered by the class representative; (3) the amount of time and effort spent by the class representative; (4) the duration of the litigation; and (5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation.

*Covillo v. Specialtys Café*, No. C–11–00594-DMR, 2014 WL 954516, at *8 (N.D. Cal. Mar. 6, 2014) (quoting *Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 299 (N.D. Cal. 1995)). A class representative must justify a service award through "evidence demonstrating the quality of plaintiff's representative service," such as "substantial efforts taken as class representative to justify the discrepancy between [his] award and those of the unnamed plaintiffs." *Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 669 (E.D. Cal. 2008).

In support of the requested service award, Plaintiff Augusto De Leon attests that he has been an active participant in this action and "spent approximately 80 hours working on this lawsuit" by: providing Class Counsel with detailed information regarding his experience as a Ricoh in employee and "documents, such as paystubs and policy documents, related to [his] employment"; working with Class Counsel in providing written responses to 4 interrogatories and 43 requests for production; "reviewing emails and other documents about Ricoh's policies and practices and the responsibilities of service and support employees"; and reviewing the Settlement Agreement and discussing it with Class Counsel. (Dkt. No. 45-5 at ¶ 9.) Plaintiff further attests that in prosecuting this lawsuit he "took the risk that future employers may be reluctant to hire [him] since [his name is associated with this case and is part of the public record." (*Id.* at ¶ 10.)

Plaintiff also attests that he risked being held financially responsible for attorneys' fees and costs "if this lawsuit was unsuccessful." (*Id.*) Class Counsel likewise attest to Plaintiff's contributions to the initiation and prosecution of this lawsuit and the risks he undertook, (*see* Dkt. Nos. 45-1 at ¶¶ 26-31 & 45-4 at ¶ 3), and assert that Plaintiff "went above and beyond what was required of him as a representative," (Dkt. No. 45 at 27).

The Court is satisfied that Plaintiff's individual contribution to this case warrants a service award; however, the requested amount—$10,000—exceeds the amount deemed presumptively reasonable in the Ninth Circuit. *See Lopez v. Bank of Am., N.A.*, No. 10-cv-01207-JST, 2015 WL 5064085, at *8 (N.D. Cal. Aug. 27, 2015) (noting that service awards of $5,000 are presumptively reasonable in the Ninth Circuit) (citing *Harris*, 2012 WL 381202, at *7 (collecting cases)). Further, the incentive award is disproportionate to the average class member's recovery, which will likely approximate $1,500. *See id.* ("When determining if an incentive payment is reasonable, courts consider the proportionality between the incentive payment and the range of class members' settlement awards.") (collecting cases). An excessively large service award can suggest that a plaintiff's financial interest in seeking a settlement does not align with interests of the absent class members because the plaintiff was "more concerned with maximizing [his own gain] than with judging the adequacy of the settlement as it applies to class members at large." *See Staton*, 327 F.3d at 977. Nor does the duration of this action support a service award outside the presumptively reasonable range. Indeed, this case was actively litigated for less than one year before the parties reached the proposed settlement in March 2019.

That said, pursuant to the Settlement Agreement Plaintiff—unlike other class members—agrees to a general release of Ricoh and the Released Parties from "any and all claims," including all unknown claims covered by California Civil Code § 1542. (*Id.* at ¶ 75(b).) Thus, the scope of Plaintiff's release as class representative exceeds that of other class members.

Accordingly, the Court concludes that a service award of $5,000 is reasonable. This award reflects the amount deemed presumptively reasonable in this Circuit, and recognizes Plaintiff's release of any and all known and unknown claims against Ricoh, which constitutes a waiver of the rights afforded him under California Civil Code section 1542.

### III. Claims Administrator Costs

The Settlement Agreement provides that the Claims Administrator will be paid a maximum of $30,000 from the Gross Settlement Amount for its fees and costs. (Dkt. No. 37-1 at ¶ 62(e).) The parties subsequently amended that provision to allow the Claims Administrator to be paid a maximum of $35,000. (*See* Dkt. No. 42-2 at 4.) The Claims Administrator's declaration in support of final approval seeks $30,000 in fees, reflecting "all costs incurred to date, as well as an estimate for the work to conclude CPT's duties and responsibilities pursuant to the settlement." (Dkt. No. 45-6 at ¶ 19.) Plaintiffs' motion for final approval likewise requests $30,000 for the Claims Administrator's administrative fees and costs. (Dkt. No. 45 at 25-26.) In support, the Claims Administrator attests to the amount requested and details the tasks CPT completed as of February 17, 2020, including creating a case-specific toll-free telephone number and website. (*See* Dkt. No. 45-6 at ¶¶ 3-11, 19.) The requested fees are adequately supported and reasonable. Accordingly, the Court awards $30,000 to the Claims Administrator.

### CONCLUSION

For the reasons set forth above, the Court grants Plaintiff's motion for final approval and grants in part Plaintiff's motion for attorneys' fees, costs, and service award. Class Counsel is awarded $550,000 in attorneys' fees and $13,643.04 in costs. Plaintiff is awarded a service fee of $5,000. Claims Administrator CPT is awarded $30,000 in administrative fees.

In accordance with the Northern District's Procedural Guidance for Class Action Settlements, "[w]ithin 21 days after the distribution of the settlement funds and payment of attorneys' fees," Class Counsel shall file "a Post-Distribution Accounting" that provides the following:

> The total settlement fund, the total number of class members, the total number of class members to whom notice was sent and not returned as undeliverable, the number and percentage of claim forms submitted, the number and percentage of opt-outs, the number and percentage of objections, the average and median recovery per claimant, the largest and smallest amounts paid to class members, the method(s) of notice and the method(s) of payment to class members, the number and value of checks not cashed, the amounts distributed to each cy pres recipient, the administrative costs, the attorneys' fees and costs, the attorneys' fees in terms of percentage of the settlement fund, and the multiplier, if any.

https://www.cand.uscourts.gov/forms/procedural-guidance-for-class-action-settlements/.  Class Counsel shall "summarize this information in an easy-to-read chart that allows for quick comparisons with other cases," and "post the Post-Distribution Accounting, including the easy-to-read chart, on the settlement website."  *Id.*

This Order disposes of Docket No. 45.

**IT IS SO ORDERED.**

Dated: March 31, 2020

_____
JACQUELINE SCOTT CORLEY
United States Magistrate Judge